792 F.2d 232
 253 U.S.App.D.C. 164
 THREE WAY CORPORATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
United Van Lines, Inc., Intervenor.
BUDD MOVING SYSTEMS, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
United Van Lines, Inc., Intervenor.
 Nos. 84-1280, 84-1282.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 9, 1985.
Decided June 3, 1986.
 
 Charles H. White, Jr., Washington, D.C., was on brief for petitioners.
 Edward J. O'Meara, Atty., I.C.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Robert S. Burk, Acting Gen. Counsel, Lawrence H. Richmond, Deputy Associate Gen. Counsel, I.C.C., Robert B. Nicholson and Marion L. Jetton, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents. John P. Fonte, Washington, D.C., entered an appearance for respondents.
 Edward J. Kiley, Washington, D.C., with whom Brainerd W. LaTourette, Jr., Clayton, Mo., Leonard A. Jaskiewicz, and James A. Calderwood, Washington, D.C., were on brief, for intervenor.
 Before EDWARDS and BORK, Circuit Judges, and GESELL,* District Judge, United States District Court for the District of Columbia.
 Opinion for the Court filed by Circuit Judge BORK.
 BORK, Circuit Judge:
 
 
 1
 Petitioners appeal the decision of the Interstate Commerce Commission approving without hearing the application of United Van Lines to amend the pooling agreement with its carrier agents. Petitioners, two affected carrier agents, argue that the amendments are anti-competitive and should not have received Commission approval under the Household Goods Transportation Act of 1980, 49 U.S.C. Sec. 11342 (1982). We find, however, that the Commission properly denied a hearing because it correctly found that the proposed amendments are "not a matter of major transportation importance and that there is no substantial likelihood that the proposed modification will unduly restrain competition."
 
 I.
 
 2
 United is a van line that operated during the relevant period, through 606 trucking company agents, of which 228, the so-called carrier agents, held their own interstate operating authority granted by the ICC. Like several other large van lines, United, which is agent-owned,[1] was created because it was not economically feasible for most carriers to contract for long-distance carriage. Household goods traffic follows no predetermined pattern and it is extremely difficult for a single, unaffiliated carrier to secure return loads. Further, 60% of all household moves take place during the four-month period between June 1 and September 30 creating equipment shortages during the peak season and leaving equipment idle during the rest of the year. To overcome these problems, the Commission has allowed groups of carriers to participate in pooling agreements where it is in the public interest. United's original pooling plan was approved in Geitz Storage & Moving Co.--Investigation of Control--United Van Lines, Inc., 65 M.C.C. 257 (1955). Approval by the Commission made it possible for United and its agents to become involved in long-distance carriage under United's name and authority and gave them a grant of antitrust immunity authorizing them to share markets and pool earnings. 49 U.S.C. Sec. 11341 (1982). The United pooling agreement also allowed the carrier agents "to continue the use of any operating authority as a carrier of household goods within the territory authorized to be served by the agent under a certificate issued by the Commission." Geitz, 65 M.C.C. at 270.
 
 
 3
 The industry situation changed when Congress enacted the Motor Carrier Act of 1980 ("MCA"), Pub.L. No. 96-296, 94 Stat. 793, and the Household Goods Transportation Act of 1980 ("HGTA"), Pub.L. No. 96-454, 94 Stat. 2011. Both Acts sought to install a system of competition and reduced regulation in the industry, and the MCA had the express purpose of making it easier for carriers to enter the interstate market or expand their operations on an interstate basis. See 49 U.S.C. Sec. 10922(b) (1982); H.R.Rep. No. 1069, 96th Cong., 2d Sess. 14, reprinted in 1980 U.S.Code Cong. & Ad.News 2283, 2296; see also Policy Statement on Motor Carrier Regulation, 44 Fed.Reg. 60,296 (1979). Several of United's agents, including petitioners, took advantage of this legislation by applying for and receiving operating authority for nationwide carriage. Carrier agents, with newly acquired operating authority, could trade on the United name and reputation and use United's services, but reserve the more profitable long-distance carriage--in the past routinely turned over to the United system--for themselves.
 
 
 4
 In response, United, in early 1981, notified its carrier agents that it planned to amend the pooling arrangement. On November 21, 1983, United formally petitioned the Commission to amend the pooling agreement because it believed that
 
 
 5
 [i]n effect, the significant majority of [United] agents are subsidizing the[ ] four [nationwide carrier agents'] own independent operations as the latter continue to rely heavily upon [United's] national identification, assignment of shipments and the broad range of support services provided by [United] to all of its agents.
 
 
 6
 ....
 
 
 7
 If this trend continues, the result will be less-than-efficient utilization of [United] equipment, which can only lead to increased costs to [United] and the shipping public, coupled with reduced service capabilities on the part of [United] and its participating agents.
 
 
 8
 Respondents' Appendix at 8, 10. United's proposed amendments required carrier agents to tender to United any shipments in excess of 1700 miles.[2]
 
 
 9
 After consideration of the petition and the opposing comments, the Commission's Review Board found that the proposed agreement was not of major transportation importance and that there was no substantial likelihood that the agreement would unduly restrain competition. Brief for Petitioners at app. 8-22. Based on those findings, the Review Board approved the applications without further hearing, as mandated by the Act. On appeal, the Commission's Division One affirmed the findings of the Review Board concluding that:
 
 
 10
 Here, the public will be better served by improving United's ability to compete with its non-agent competitors than by increasing the level of competition within the United system. While certain United agents may be adversely affected by their proposed exclusion from the long-haul market, it is clear that the public interest is best served by protecting competition itself rather than these individual competitors. Moreover, if the agents desire to continue competing with United for long-haul traffic, they may readily do so by severing their agency relationship with the United system.... [I]n strengthening United's ability to compete with other van lines, the proposal will more likely result in an increased overall level of competition and a corresponding enhancement of the public benefits which derive therefrom.
 
 
 11
 Brief for Petitioners at app. 4. It is from these decisions that petitioners appeal.
 
 II.
 
 12
 The question presented for us on review is whether the Commission's decision not to give petitioners a hearing was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1982).
 
 
 13
 Prior to the MCA, the Commission was required to hold a hearing to review all petitions. See 49 U.S.C. Sec. 5(1) (1976). In passing the MCA, Congress provided for expedited review of pooling agreements by requiring the Commission to
 
 
 14
 determine whether the agreement or combination is of major transportation importance and whether there is substantial likelihood that the agreement or combination will unduly restrain competition. If the Commission determines that neither of these two factors exists, it shall, prior to such effective date and without a hearing, approve and authorize the agreement or combination....
 
 
 15
 49 U.S.C. Sec. 12342(b)(1) (1982) (emphasis added); see 49 U.S.C. Sec. 11342(b)(3) (1982); H.R.Rep. No. 1372, 96th Cong., 2d Sess. 10, reprinted in 1980 U.S.Code Cong. & Ad.News 4271, 4280 ("[T]he Commission is directed to simplify and expedite its review of such agreements to the maximum extent practicable."). The Commission then must grant a hearing only when in its preliminary review it determines that the agreement is (1) of major transportation importance, or (2) will unduly restrain competition. To further the policy of expeditious review and deregulation, the HGTA provided that such agreement or combination shall be presumed to be in the interest of better service to the public and of economy in operation and not to restrain competition unduly if the practices proposed to be carried out under such agreement or combination are the same as or similar to practices carried out under agreements and combinations between motor common carriers providing transportation of household goods to pool or divide traffic or services of any part of their earnings approved by the Commission before the date of enactment of this paragraph.
 
 
 16
 49 U.S.C. Sec. 11342(b)(2) (1982).[3] These statutory directions guide our review of the Commission's decision.
 
 A.
 
 17
 Petitioners argue that the Commission failed adequately to explain its refusal to order a hearing in this case although it conducted one with respect to an analogous modification of Atlas Van Lines' pooling agreement. See Motor Carriers, Atlas Van Lines, Inc., et al.--Pooling Application, 48 Fed.Reg. 11,795 (1983). We disagree. In that case, Atlas announced that it intended to cancel its existing pooling agreement, under which its carrier agents could exercise independent operations to the extent of their certified authority. In place of this cancelled agreement, the van line proposed to execute a pooling agreement with those agents who possessed interstate authority only to the extent of so-called Kingpak, military pack-and-crate, and government commodities traffic. See Joint Brief for Respondents ICC & USA, addendum B, at 1; see also Household Goods' Carrier Bureau v. United States, 288 F.Supp. 641 (N.D.Cal.) (discussing what constitutes Kingpak traffic), aff'd mem., 393 U.S. 265, 89 S.Ct. 477, 21 L.Ed.2d 426 (1968). Any carrier agent holding interstate authority involving more than those limited classes of traffic had to transfer or otherwise dispose of its certificate to remain within the Atlas network. In determining whether to approve the new pooling agreement with the thirty agents that possessed the limited authority tolerable under Atlas' new policy, the Commission did, to be sure, provide a hearing, but was influenced in its decision to do so by its view that the new pooling arrangement had to be viewed in light of Atlas' pooling with respect to all of its agents, i.e., that Atlas would "no longer pool with agents holding and operating under authority broader than that specified in the [new] agreement." See 48 Fed.Reg. 11,795 (1983). The impact they considered, therefore, extended not merely to those thirty carrier agents who joined the limited pooling agreement but also to the remainder of the carrier agents who could not continue to exercise their ICC-granted interstate authority. Because it had approved the Atlas changes and the industry was being restructured, the Commission concluded that the United changes in its pooling agreement were relatively insignificant. Thus, a further hearing was unnecessary because "the proposed pooling agreement modification [was] not a matter of major transportation importance and that there [was] no substantial likelihood that the proposed modification [would] unduly restrain competition." Brief for Petitioners at app. 19. Moreover, the Commission in Atlas, following the submission of written comments and evidence, did find that the proposed agreement was not one of major importance and was unlikely to affect competition adversely. Atlas Van Lines, Inc.--Pooling Application, No. MC-F-15004 (ICC July 15, 1983) (unpublished); Joint Brief for Respondents ICC & USA at addendum B. We cannot say, therefore, that the Commission's holding of a hearing with respect to Atlas required another hearing with respect to United.
 
 
 18
 Further, Congress has directed the Commission to "expedite, to the maximum extent practicable," the process and approval of applications. It, therefore, would not be in keeping with the HGTA to require the Commission to ignore experience gained in the process of reviewing these matters. Having recently decided that the analogous Atlas proposal was not of major transportation importance and would not unduly restrain competition, it was not necessary for the Commission to hold hearings on United's proposal. Cf. National Classification Committee v. ICC, 779 F.2d 687, 693 (D.C.Cir.1985).
 
 
 19
 The United petition is also entitled to a presumption of validity under the HGTA if it is substantially similar to practices carried out under pooling agreements in effect at the enactment of the HGTA. 49 U.S.C. Sec. 11342(b)(2) (1982). When the HGTA was enacted, several national van lines did not allow their agents to carry any independent operating authority. Allied Van Lines, for example, allows none of its agents to have independent operating rights in direct competition with it. See Evanston Fireproof WHSE--Control--Allied Van Lines, 40 M.C.C. 557 (1946); see also Practices of Motor Common Carriers of Household Goods, 115 M.C.C. 628, 638 (1972). United, however, allows its agents to exercise their independent authority and restricts only their long-haul carriage. Under the United agreement, agents can obtain interstate authority, but must limit their independent carriage to hauls of less than 1700 miles. Because 49 U.S.C. Sec. 11342(b)(2) commands the Commission to "presume[ ]" a pooling agreement "to be in the interest of better service to the public and of economy in operation and not to restrain competition unduly" when that agreement is "the same as or similar to practices" existing prior to the enactment of the HGTA, it would be futile to set a hearing on United's petition when there exist more restrictive pre-HGTA agreements that by section 11342(b)(2) enjoy presumptive validity. Where a hearing would serve little purpose, none is required. Cf. National Classification Committee v. ICC, 779 F.2d at 693; Citizens for Allegan County, Inc. v. FPC, 414 F.2d 1125, 1128 (D.C.Cir.1969).
 
 
 20
 The United amendment also could be considered similar enough to its original pooling agreement to escape the necessity for a hearing under the statute. The original agreement allowed the agents to operate to the fullest extent of their Commission-granted operating authority. However, this agreement was drafted at a time when United and the Commission knew the agents were ineligible to conduct nationwide carriage. For thirty years, the United system operated with no carrier agent having nationwide authority. In approving the original plan, the Commission recognized that
 
 
 21
 United is assured of sufficient traffic to perform nationwide long-distance hauling with a minimum of empty or partially loaded vehicle mileage at the lowest rates consistent with good service, and the carrier-agents can perform expedited more or less short-haul service immediately available to shippers in the vicinities of their domiciles.
 
 
 22
 Geitz, 65 M.C.C. at 297. Not until passage of the MCA with its deregulatory policies did any of United's carrier agents have independent nationwide authority. The United amendment does not return the system to the status quo ante but does move in that direction in order to avoid the inefficiencies created by carrier agents with their own nationwide authority who are able to use United's reputation and services for their own accounts without paying for those benefits. United's amendment affects only a small number of carriers and would actually leave the competitive posture of the United system essentially unchanged, something Congress felt was acceptable when it passed section 11342(b)(2).
 
 
 23
 Petitioners finally argue that United's action has effectively modified their operating certificates without a hearing contrary to "statutory directive, ... Commission policy, and established court precedent." See Brief for Petitioners at 54-55 (footnotes omitted). The authorities cited by petitioners are inapposite. Each involves an explicit Commission revocation or modification. Here the Commission has not taken any steps to modify the certificates. Any modification is in the use made of the certificate, not to the certificate itself. Petitioners need not modify the use of their operating authorities unless they choose voluntarily to remain with United. That situation does not constitute a modification made subject to a hearing requirement by 49 U.S.C. Sec. 10925 (1982).
 
 B.
 
 24
 Petitioners also argue that the United proposal will unduly restrain competition and therefore a hearing is mandated. They contend that by limiting the independent operating authority of the carrier agents to independent carriage of less than 1700 miles, United has drastically reduced intra-system competition.
 
 
 25
 It is clear that the MCA and HGTA actively seek to promote competition through deregulation of the household goods industry. See H.R.Rep. No. 1372, supra, at 5. The Commission has interpreted these statutes to be concerned with inter-firm, not intra-firm, competition. The Commission held that "the public interest is best served by protecting competition itself rather than these individual competitors." Division 1 Decision, Brief for Petitioners at app. 4. The Commission noted that agents who want to compete with United for long-haul traffic "may readily do so" by leaving United. Id.[4] Petitioners argue that these statements fail to consider the realities of competition in the household goods transportation industry. Petitioners, however, fail to show any indication in the MCA, HGTA, or the legislative histories of those acts that the Commission's interpretation of the statutes is incorrect. Indeed, petitioners merely assume that the lack of intra-firm competition will worsen the overall competitive nature of the industry without offering the Commission or this court any reason to agree.
 
 
 26
 As the Commission recognized, United's proposed pooling agreement, like all pooling agreements, will certainly impose some restraint on rivalry. Congress recognized that pooling agreements have served the public interest and provided for their continuance by reducing the obstacles to approval of such agreements. See 49 U.S.C. Sec. 11342(b)(1), (b)(3). The statute, therefore, requires a hearing only when the action "unduly restrains competition." 49 U.S.C. Sec. 11342(b)(1).
 
 
 27
 Here competition between United and all other principal carriers is not lessened. All United has done is eliminate a free-rider problem within its system. The United agreement has allowed for efficient service of a nationwide market, something no one of the independent carriers could achieve alone. Allowing the carrier agents to compete without restriction makes it possible for them to rely on United and other agents to spend the time and money on training, equipment, services, and promotion to convince prospective customers that United has a superior service. But when a customer comes to a carrier agent, the carrier agent can choose to transport the goods under its independent authority without any obligation to United. The United amendment is an appropriate response to ensure that the level of United's assistance to its carrier agents corresponds with the carrier agents' level of use of United's interstate authority. There is no indication that United is trying to restrain competition at all. Indeed, the purpose of its changes is to promote more efficient competition with other national van lines.
 
 
 28
 The competitive significance of restraints on carrier agents within a van line are analyzed in another case decided by this court today, Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210 (D.C.Cir. 1986). Several carrier agents in the Atlas network, forced by Atlas either to transfer their interstate authority to a separate corporation or to dissociate themselves from the network, brought a lawsuit charging an unlawful conspiracy in restraint of trade between Atlas and various of its carrier agents under section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1982). On a motion for summary judgment, the district court dismissed the plaintiff carrier agents' claim on several different grounds. See Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 597 F.Supp. 217 (D.D.C.1984). A panel of this court, finding that Atlas' policy was "designed to make the van line more efficient rather than to decrease the output of its services and raise rates," Rothery, op. at 211, affirmed the district court's decision.
 
 
 29
 The court in Rothery recognized the restriction on the independent exercise of carrier agent authority as an efficiency-producing restraint, ancillary to the contractual integration among Atlas and its agents. See Rothery, at 211-212, 214, 216, 221-223. The court accepted the district court's conclusion that Atlas' carrier agents, while competing with Atlas in undertaking carriage for their own accounts, derived a subsidy from their affiliation with the Atlas network. See id. at 222. Such free riding, the court found, would produce an inevitable tendency to distort economic signals, causing carrier agents to overconsume Atlas' centralized services in dealing for their own accounts and weakening the van line's incentive to provide such services, thus decreasing the system's effectiveness in serving consumers. See id. at 222-223. The court recognized the restraint imposed by Atlas as a classic attempt to counter free riding and to eliminate the economic distortions within the Atlas system. Though the present case arises in a different legal context, Rothery's discussion of the economic effects of such intra-van line restraints is applicable here and supports the Commission's decision, which we affirm.
 
 
 30
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 292(a) (1982)
 
 
 [1]
 When United was before the Commission it had 129 stockholders, each of which owned 45 shares. All but eight of the stockholders are active agents. Approximately two-thirds of these agents are carrier agents
 
 
 [2]
 Prior to the United amendment, carrier agents could select one of three operating methods for transportation of household goods. The first allowed independent carriage on movements up to 750 miles; the second up to 1500 miles; and the third allows unlimited mileage. The extent to which United leased equipment from agents, allowed interlining of shipments between United and agent at point of origin, and otherwise assisted the particular agents depended on the method selected. The less independence elected by carrier agents, the more assistance United gave to them. Of United's 228 carrier agents in 1983, 207 chose the first plan, 17 the second, and only 4 the third
 
 
 [3]
 The HGTA included other provisions to further the goal of deregulation of the household goods transportation industry. For example, the HGTA makes principal carriers fully responsible for the acts and omissions of their agents. 49 U.S.C. Sec. 10934(a) (1982). The HGTA also provided an exemption from the antitrust laws for any discussions or agreements between a principal and its agents concerning rates, charges, allowances, or ownership. 49 U.S.C. Sec. 10934(d) (1982)
 
 
 [4]
 In response to the limitation of intra-firm competition by their principals, several independent carrier agents have severed ties and have started new van lines to compete with their former principals. See, e.g., A. Ronald & Son Transfer & Storage Co.--Pooling Application, No. MC-F-15239 (ICC July 1, 1983) (unpublished); Joint Brief for Respondents ICC & USA at addendum C (approval of a pooling application involving 28 household goods carriers, several of which were former carrier agents of larger principal carriers)